## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

---

Areryana Bush, as trustee for the next of kin
of Melvin Tyrone Bush, deceased,

                Plaintiff,

v.

Advanced Correctional Healthcare, Inc.,
USA Medical & Psychological Staffing, S.C.,
Jacob Hanson, in his individual capacity,
Dalton Clouse, in his individual capacity,
Shelby Nesler, in her individual capacity,
and Olmsted County,

                Defendants.

Case No. 25-cv-00310 (MJD/DTS)

**First Amended Complaint**

**Jury Trial Demanded**

---

For her First Amended Complaint, Plaintiff Areryana Bush ("Plaintiff") as trustee for the next of kin of Melvin Tyrone Bush states and alleges upon knowledge, information, and belief as follows:

### Introduction

1.    This case arises from the preventable and tragic death of Melvin Tyrone Bush ("Melvin"), a 59-year-old detainee at the Olmsted County Jail, who died from acute complications of a perforated duodenal ulcer—a serious medical condition that required prompt and appropriate care.  Despite presenting with obvious and escalating signs of a life-threatening condition, including severe abdominal pain, abnormal vital signs, and clear indicators of sepsis, the Defendants exhibited deliberate indifference to his serious medical needs.  Instead of providing and escalating care, Defendants failed to conduct

adequate assessments, ignored critical warning signs, and dismissed Melvin's condition as drug withdrawal, all while he suffered and pleaded for help. Egregiously, body worn camera footage that captured evidence of this event was either destroyed or has gone missing.

2.      This is an action for damages pursuant to 42 U.S.C. § 1983 against the Defendants due to their deliberate indifference to Melvin's objectively serious medical needs, known by Defendants, with supplemental state law claims.

## Parties

3.      Melvin was 59 years old. While Melvin struggled with addiction, he was deeply loved by his very large family. To his grandchildren, he was "Papa." Melvin resided in Rochester at the time of his death.

4.      Plaintiff is Melvin's daughter. She is active duty in the US Army and was appointed as the trustee for Melvin's next of kin.

5.      Defendant Olmsted County (the "County") is a county within and a political subdivision of the State of Minnesota. It is a body politic and corporation subject to suit pursuant to Minn. Stat. § 373.01 *et seq.* The County is also defined as a municipality for purposes of tort liability pursuant to Minn. Stat. § 466.01 *et seq.* The County owns and operates the Olmsted County Adult Detention Center in Rochester, Minnesota (the "Jail").

6.      The County employs deputy correctional officers and other staff at the Jail.

7.      All acts and omissions of Jail correctional personnel identified herein are the acts and omissions of the County.

8.    Defendant Advanced Correctional Healthcare, Inc. ("ACH") is a private corporation with a principal place of business in Franklin, Tennessee that is licensed to do and does business in the State of Minnesota.

9.    The County contracted with ACH to fulfill the County's constitutionally required and nondelegable healthcare obligations to inmates and detainees at the Jail.

10.    USA Medical & Psychological Staffing, S.C. ("USA Medical") is a private corporation with a principal place of business in Franklin, Tennessee that is licensed to do and does business in the State of Minnesota.

11.    ACH subcontracted with USA Medical, a subsidiary and/or affiliate of ACH, to provide medical services at the Jail, thereby making all USA Medical personnel working at the Jail agents of ACH and the County for which ACH and the County have liability.  USA Medical's liability is thus imputed on ACH and the County.

12.    USA Medical employs medical personnel and provides the services of those personnel as medical staff to the Jail for the purposes of providing healthcare to the Jail detainees.

13.    Employees of the County, USA Medical, and ACH all work under color of state law for purposes of 42 U.S.C. § 1983.

14.    Defendant Jacob Hanson ("Nurse Hanson") is a registered nurse working at the Jail.  Nurse Hanson was employed by and/or was an agent of USA Medical, ACH, and the Jail.  Nurse Hanson is sued in his individual capacity.

15. All acts and omissions of Jail medical staff, including but not limited to Nurse Hanson, are the acts and omissions of ACH, USA Medical, and the County for which ACH, USA Medical, and the County are liable.

16. Defendant Dalton Clouse ("Deputy Clouse") was a sheriff's deputy and correctional officer at the Olmsted County Jail.

17. Defendant Shelby Nesler ("Deputy Nesler") was a sheriff's deputy and correctional officer at the Olmsted County Jail. Deputy Nesler is sued in her individual capacity.

18. All acts and omissions of Deputies Clouse and Nesler are acts and omissions of the County for which the County is liable.

### Jurisdiction and Venue

19. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3). The aforementioned statutory and constitutional provisions confer original jurisdiction over this action. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

20. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the District of Minnesota.

## Background

**I.    Overview of relevant medical concepts.**

21.    Abdominal pain can have a wide variety of causes, several of which are life threatening.

22.    Some life-threatening causes indicated by abdominal pain include but are not limited to appendicitis, peptic ulcers, intestinal obstruction, abdominal aortic aneurysms, and gastrointestinal perforations.

23.    A gastrointestinal perforation occurs when a hole forms in the wall of any part of the gastrointestinal tract, including the stomach, small intestine, or large intestine.

24.    A duodenal perforation is a perforation of the first section of the small intestine, directly connected to the stomach.

25.    A duodenal perforation can be caused by a host of conditions, including but not limited to peptic ulcers, trauma, foreign bodies or objects, and inflammatory diseases.

26.    When there is duodenal perforation, contents of the duodenum such as partially digested food, gastric acids, and digestive enzymes, leak into the sterile abdominal cavity (i.e., the peritoneal cavity).

27.    The leaking of such contents into the peritoneal cavity results in a condition known as peritonitis, which is an inflammation of the peritoneum—the membrane that lines the inside of your abdomen—caused by infection.

28.    If peritonitis is not promptly and effectively treated, the infection can spread from the initial site in the peritoneum into the bloodstream, resulting in sepsis.

29.     If not promptly and effectively treated, sepsis can result in death.

30.     A duodenal perforation is an objectively serious and dangerous condition that can result in death if it is not promptly and effectively treated.

31.     When a patient presents to a nurse with overt and severe pain localized to the abdomen, a thorough assessment of the patient must be performed to assess if a patient has one of these life-threatening illnesses.

32.     The standard of care for a nurse encountering a patient with overt and severe pain localized to the abdomen requires that the nurse obtain a detailed patient history, perform a physical examination focused on the abdominal region, take critical vital signs, and promptly communicate findings to the doctor or similar advanced practitioner.

33.     The basic elements for a nursing examination of the abdomen include: inspection of the abdomen to note any visible abnormalities; auscultation—to listen for bowel sounds or any unusual noises; percussion—to assess for abnormalities such as fluid accumulation or enlarged organs; and palpation—to check for tenderness, distension, rigidity, or masses.

34.     When a patient is exhibiting overt and severe pain localized to the abdomen, it is outside the standard of care for a nurse to require the patient to engage in unnecessary physical activity such as walking or crawling.

35.     Forcing a patient to walk or crawl can exacerbate numerous life-threatening abdominal conditions, such as appendicitis, intestinal obstruction, or gastrointestinal perforation.

36.     Among other things, forcing a patient with a duodenal perforation to crawl and walk unnecessarily: (a) increases the risk of expanding the perforation; (b) increases the risk of spreading infection; and (c) aggravates pain and discomfort.

37.     In addition to the physical examination, when a patient is exhibiting overt and severe pain localized to the abdomen, the nursing standard of care requires a nurse to record the following vitals: blood pressure, heart rate, respiratory rate, temperature, and oxygen saturation.

38.     When a patient is exhibiting overt and severe pain localized to the abdomen, taking only some of these vital signs (or even all of these vital signs) without a physical examination is not sufficient to meet even the most minimal threshold of the nursing standard of care, as a patient suffering from a life-threatening abdominal condition may not initially exhibit some or all of the concerning signs and symptoms.

39.     Sudden, severe pain localized to the abdomen are not consistent with drug or alcohol withdrawal.

40.     It is not consistent with drug or alcohol withdrawal for a patient to experience such overt and severe pain localized to the abdomen that renders the patient unable to stand fully erect.

41.     Pain associated with drug withdrawal is more diffuse; it is not overt and severe pain localized to the abdomen.

42.     Drug withdrawal is also known to be a potentially deadly condition that can cause a number of other deadly conditions, including bowel perforations.

43. If a patient were believed to be experiencing overt and severe pain localized to the abdomen from drug withdrawals, the nursing standard of care still requires the workup described above, i.e., physical examination, complete taking of vitals, and communication with a doctor or similar advanced practitioner.

44. If any doctor or similar advance practitioner acting within the standard of care were informed by a nurse that a patient were experiencing overt and severe pain localized to the abdomen, that provider would ensure that a complete physical examination and taking of vitals were performed to ensure that the patient were not suffering from a life-threatening abdominal condition, such as a perforated duodenum.

**II.    The deliberate indifference to the serious medical needs of Melvin Bush.**

45. On March 1, 2023, Melvin was arrested on suspicion of violating a no contact order and detained at the Jail.

46. Melvin disclosed at booking that he suffered from high blood pressure and that he was presently taking suboxone, as depicted in the booking medical questionnaire below:



### Completed Questionnaire

Print Date/Time:  03/09/2023 11:00
Login ID:  domain-a\lejshage
Inmate:  Bush, Melvin Tyrone

Olmsted County Sheriffs Office
ORI Number:  MN0550000
Booking #:  2023-00000605

#### Questionnaire: Booking Medical Questions

Arrest Datetime:  03/01/2023 18:21          Given By:  5012 - Williams 03/01/2023 20:05

| Arresting Officers | Agency | Brought In By | Agency |
|---|---|---|---|
| 2513 - Goergen | MN0550100 | | MN0550100 |

| Question # | Question | Response | Response Value |
|---|---|---|---|
| 1 | Do you have any body piercings? | Yes, describe | 0 |
| | Comments: ear | | |
| 1a | Is this an EAM/EHM booking? | No | 0 |
| 2 | Do you have a regular doctor? | Yes, Dr.'s name & clinic | 0 |
| | Comments: Olmsted | | |
| 3 | Do you have a regular dentist? | No | 0 |
| 4 | Do you have insurance or medical assistance? | No | 0 |
| 5 | Do you have any current illnesses or health issues? | Yes, list all | 0 |
| | Comments: Suboxone, High BP | | |

47.    Melvin tested positive for several substances and was prescribed a cocktail of mild withdrawal medications on March 2, 2023, but was not prescribed suboxone.

48.    Despite disclosing a history of drug use with the potential for withdrawals and high blood pressure, no medical personal from ACH or USA Medical took vital signs from Melvin from March 2 through March 4, 2023.

49.    Indeed, Jail policy 708.1 required that a qualified health care professional complete an initial health appraisal "following their arrival at this facility…".

50.    Jail policy 708.3 required that an initial recording of vital signs include blood pressure, pulse, respiration rate, and temperature.

51.    This reflects both a custom of indifference and a violation of the standard of care as the taking of vital signs is critical to assess the severity of withdrawal, which

could be life threatening, and baseline vitals in the event an inmate becomes ill at a later point in detention.

52.     Jail Policy 717.2 expressly notes that "[w]ithdrawal from alcohol and drugs can be a life-threatening medical condition requiring professional medical intervention."

53.     Despite not receiving his prescribed medication, Melvin had no medical complaints over the next several days.

54.     On the morning of March 5, 2023, Melvin began suffering from spontaneous and intense stomach pain.

55.     For the first time on the morning of March 5, 2023, Melvin refused his withdrawal medications when Nurse Hanson offered them during medication rounds at approximately 7:30 a.m.

56.     Melvin did not even want to get out of bed when Nurse Hanson came through that morning.

57.     Nurse Hanson also knew that Melvin was not eating.

58.     Later that morning, Melvin used the intercom to call the control room to inform Deputies Nesler and Clouse about the intense pain.

59.     Melvin told the Deputies that "he needed to see a doctor ASAP."

60.     Deputy Nesler escorted Nurse Hanson to Melvin's cell at approximately 10:30 a.m. on March 5, 2023.

61.     When Nurse Hanson met with Melvin at 10:30 a.m., Nurse Hanson knew that:

    a.  Melvin had a history of high blood pressure;

10

b.  Melvin had a history of drug use but had made no complaints of

withdrawal symptoms since booking;

c.  The onset of Melvin's abdominal pain was severe and spontaneous;

d.  Melvin was not eating;

e.  Melvin had refused his withdrawal medications; and

f.  Melvin had asked to see a doctor.

62.  When Nurse Hanson met with Melvin, he also learned that Melvin had

been throwing up.

63.  Nurse Hanson observed from stains in Melvin's cell that the color of vomit

was green, indicating to Nurse Hanson that Melvin was vomiting bile.

64.  Nurse Hanson palpated Melvin's stomach and observed an area of

tenderness where Melvin reported an increase in pain.

65.  Nurse Hanson did not document a complete abdominal examination.

66.  Nurse Hanson then took only a partial set of vitals from Melvin, consisting

of his temperature and blood pressure.

67.  Melvin's temperature was 96 degrees, which is an abnormal finding.

68.  Melvin's blood pressure was 99/60, which is also an abnormal finding,

especially when a patient has a history of high blood pressure.

69.  In an interview with Olmsted County investigators after Melvin's death,

Nurse Hanson acknowledged that Melvin's blood pressure was "somewhat low."

70.    Nurse Hanson further stated in the interview that "[i]t could be that a lot of people just live at that blood pressure," ignoring that Melvin suffered from **high** blood pressure.

71.    Despite being in possession of all of this concerning information, Nurse Hanson did not take Melvin's pulse, respiratory rate, or oxygen saturation, as depicted in the chart below:

Site: Olmsted County MN
Inmate Name: Melvin Bush
Inmate ID: -80082

| Created By: | Jacob Hanson RN | | | | | | |
|---|---|---|---|---|---|---|---|
| Recorded Date: | 3/5/2023 | Recorded Time: | 10:30 AM | | | | |
| Created Date: | 3/5/2023 | Created Time: | 6:33 PM | | | | |

| Temp | Pulse | Respiratory | Systolic BP | Diastolic BP | Weight | Height | O2 Saturation |
|---|---|---|---|---|---|---|---|
| 96 | | | 99 | 60 | | | |

72.    Any layperson meeting with Melvin when Nurse Hanson did at 10:30 a.m. would easily recognize that Melvin needed attention from a doctor or higher level of care than Nurse Hanson could offer.

73.    Melvin exhibited clear signs of potentially fatal abdominal issues and sepsis, including severe and sudden abdominal pain, vomiting bile, a low temperature of 96°F, and low blood pressure of 99/60, suggesting early shock or hypoperfusion (insufficient blood flow).  Combined with his refusal to eat, lethargy, and history of hypertension, these symptoms demanded immediate medical attention and suggested a condition beyond what could be managed in the jail setting.

74.    The standard of care required Nurse Hanson to perform a complete assessment, including pulse, respiratory rate, and oxygen saturation, and escalate

Melvin's care based on his abnormal findings.  Nurse Hanson should have notified a physician, and arranged for emergency medical evaluation, as his condition clearly exceeded the scope of care possible in the jail.

75.    Rather than performing the complete assessment and seeking an elevated level of medical care, Nurse Hanson advised Melvin that he was simply suffering from withdrawals and had Melvin take the mild withdrawal medications that Melvin previously declined.

76.    Nurse Hanson charted that, "[e]vidence of withdrawal symptoms very apparent as there was old vomit on the floor and diarrhea in the commode."

77.    Despite Melvin's obvious and serious medical needs, Nurse Hanson failed to promptly return, at least within the hour, to recheck Melvin's vitals to determine if his health was improving or declining.  He also failed to take steps to put Melvin on a higher level of watch rather than standard 30-minute wellbeing checks.  This also reflected a deliberate indifference to Melvin's serious medical needs and was a violation of the standard of care.

78.    Even if Melvin were suffering from withdrawals, the standard of care still required a complete assessment of Melvin's vitals, a thorough abdominal assessment, a return by Nurse Hanson to recheck Melvin's vitals, and closer monitoring by medical and correctional staff.

79.    Thus, Nurse Hanson was deliberately indifferent to Melvin's medical needs and violated the standard of care even if Nurse Hanson deliberately disregarded Melvin's

obvious and objectively serious medical needs by writing Melvin's pain off as simply withdrawals that did not require escalated care.

80.   Deputy Nesler and Nurse Hanson left Melvin to continue suffering even though it would have been obvious to any layperson that Melvin had serious medical needs and needed a higher level of care than Nurse Hanson could offer.

81.   After Nurse Hanson left, Melvin continued to suffer and decline for several hours.

82.   Deputy Nesler informed investigators that she knew her body camera was on when taking Melvin's vitals, but Olmsted County has represented that this video and other body camera video of Melvin during wellbeing checks no longer exists.

83.    This video no longer exists no longer exists despite County's notice of potential litigation and despite the fact that Sheriff Support Technician Michelle Jacobson specifically logged that on March 5, 2023 that this video evidence was preserved:



| | **Olmsted County Sheriff** | CASE# **2023-00905566** |
|---|---|---|
| **SHERIFF** | **EVENT SUPPLEMENT** 101 4th Street SE Rochester, MN 55904 | REVIEWED BY **Hanson 1675** |

| **SUPPLEMENT** |
|---|

**SYNOPSIS**

I, Sheriff Support Technician, Michelle Jacobson was assigned to verify the wellbeing checks were completed that were listed on the wellbeing check log. The wellbeing checks were captured on the assigned users body cameras within our evidence management software, Polaris. I viewed the body cameras noting the time the wellbeing checks were completed for cell I7 (see attached) and provided that information to Investigator Olson. I added those body camera recordings to the case file in Polaris.

84.     Melvin contacted Deputies Nesler and Clouse several times on the intercom informing them that his "stomach is still hurting."

85.     Deputies Nesler and Clouse did not visit with Melvin for several hours; instead, Deputy Clouse told Melvin that he needed to let the medications set in.

86.     Melvin continued to yell in pain, which Deputies Nesler and Clouse could hear.

87.     Multiple inmates informed Deputies Nesler and Clouse that Melvin was asking for a doctor and telling the other inmates that his stomach was hurting.

88.     One inmate told Deputy Nesler, "I think the guy up in I-7 needed a doctor, he was calling for help."

89.     Surveillance video showed Melvin making his way to the common area, but he was in too much pain to walk unassisted, he nearly fell, and could not sit upright:







90.     Deputies Nesler and Clouse saw Melvin almost fall down the stairs as Melvin made his way into the common room and saw him then unable to sit up straight.

91.     Melvin went upstairs, and at approximately 1:30 p.m., Melvin used the intercom to once again beg Deputy Clouse for help.

92.     Melvin told Deputy Clouse that his stomach pain was getting worse and the medication was not making it any better.

93.     Deputy Clouse responded that, "Medical said you're just withdrawing, just try to give the medication some time to work."

94.     Melvin responded, "No, it's not working. I just need medical down here, I need to see them. I need to see them now."

95.     It took witnessing Melvin's near fall and the continued pleas of Melvin and other inmates before Deputies Clouse and Nesler finally contacted Nurse Hanson again.

96.     When Deputy Clouse did call Nurse Hanson, Deputy Clouse delegitimized Melvin's need for care to Nurse Hanson, rather than conveying the obvious and serious medical needs that Melvin was expressing and that Deputy Clouse, Deputy Nesler, and other inmates had observed.

97.     Deputy Clouse told Nurse Hanson, "[c]an you just come down take a look at him, just give him peace of mind[?]"

98.     Deputy Clouse escorted Nurse Hanson to Melvin's cell at approximately 1:38 p.m.

99.     When they arrived at the cell, Melvin told Nurse Hanson that "[i]t feels like needles and knifes [sic] stabbing my belly."

100.    Despite Melvin's prior concerning vitals and abdominal pain, Nurse
Hanson once again did not take a complete set vitals, failing to take Melvin's pulse and
oxygen saturation, as depicted below:

| Created By: | Jacob Hanson RN | | | | | | |
|---|---|---|---|---|---|---|---|
| Recorded Date: | 3/5/2023 | Recorded Time: | 1:45 PM | | | | |
| Created Date: | 3/5/2023 | Created Time: | 7:06 PM | | | | |
| Temp | Pulse | Respiratory | Systolic BP | Diastolic BP | Weight | Height | O2 Saturation |
| 96 | | 40 | 105 | 81 | | | |

101.    Once again, Nurse Hanson did not enter Melvin's vitals for this visit until
after Melvin had died, this time entering the incomplete vitals at 7:06 p.m.

102.    Melvin's recorded temperature of 96 was once again low.

103.    Melvin's respiratory rate of 40 was significantly elevated.  The normal
adult respiratory rate is 12-18 breaths per minute.  This showed that Melvin was
tachypneic (experiencing an abnormally rapid breathing) and was indicative of several
potential critical conditions that needed to be immediately evaluated by a doctor or other
higher level of provider, particularly in light of Melvin's other concerning signs and
symptoms.

104.    This elevated respiratory rate also particularly called for Nurse Hanson to
check Melvin's oxygen saturation because tachypnea often signals hypoxia or impaired
oxygen delivery to tissues, which can occur in the context of sepsis, respiratory distress,
or shock.  Measuring oxygen saturation would have provided critical information about
Melvin's respiratory and circulatory status, helping to determine whether he required
supplemental oxygen, further diagnostic testing, or emergent medical intervention.  By

failing to assess oxygen saturation, Nurse Hanson neglected a fundamental and necessary step in evaluating Melvin's rapidly deteriorating condition.

105.    Nurse Hanson documented a blood pressure reading of 105/81. Considering Melvin's progression from sepsis to death as discussed below, it is virtually impossible for Melvin's blood pressure to have improved from the earlier reading of 99/60 absent substantial medical intervention.

106.    Hanson's documentation of a blood pressure reading of 105/81 is inconsistent with Melvin's clinical presentation and other findings, suggesting either fabrication or error in measuring the blood pressure.

107.    Nurse Hanson did not conduct a physical examination of Melvin's abdomen during this second visit, despite Melvin's prior positive indication for abdominal pain upon touch.

108.    Nurse Hanson told Melvin, "I assessed you before, your stomach is fine. I'm assessing you now, vitally you're stable … [y]ou can take comfort in that."

109.    Nurse Hanson then left Melvin's cell at approximately 1:45 p.m. and provided Melvin with no meaningful treatment to address Melvin's serious medical needs.

110.    Nesler then conducted her wellbeing check by looking into Melvin's cell for approximately one second at 1:46 p.m.

111.    Nurse Hanson returned with Deputy Clouse at approximately 1:50 p.m., reporting that he gave Melvin antacid, ibuprofen, peanut butter, and crackers.

112.    They remained in Melvin's cell for approximately one minute.

113.    Nurse Hanson made no arrangements to return, and did not return, to check Melvin's concerning vitals.

114.    The medical standard of care required Nurse Hanson to take a complete and accurate set of vital signs during his 1:45 p.m. visit with Melvin.  This included measuring and documenting Melvin's pulse, respiratory rate, oxygen saturation, blood pressure, and temperature, as well as conducting a thorough reassessment of Melvin's worsening symptoms.

115.    Additionally, given Melvin's severely elevated respiratory rate, continued low temperature, reported pain, and inability to walk unassisted, Hanson was required to recognize these as signs of sepsis, shock, or another life-threatening abdominal condition.  At a minimum, Hanson should have immediately notified a physician or an advanced practitioner, requested further diagnostic testing, and escalated care to a facility capable of managing Melvin's deteriorating condition, such as an emergency department.

116.    Instead of fulfilling these obligations, Hanson again failed to take a complete set of vital signs, neglecting critical indicators such as Melvin's oxygen saturation and pulse.  Hanson also failed to address Melvin's respiratory rate of 40, which was a clear red flag for systemic distress, including hypoxia, acidosis, or septic shock.  By failing to take these steps, Hanson violated the basic standard of care for assessing a critically ill patient.

117.    Nurse Hanson's actions also demonstrate deliberate indifference to Melvin's serious medical needs.  Hanson knew Melvin was experiencing severe

abdominal pain, vomiting bile, and exhibiting multiple abnormal vital signs. Despite this, Hanson failed to take appropriate action, opting instead to dismiss Melvin's condition as withdrawal-related, even though Melvin's symptoms were inconsistent with drug withdrawal. By failing to perform necessary assessments, seek higher-level care, or monitor Melvin's condition more frequently, Hanson disregarded Melvin's obvious and urgent need for medical intervention.

118.    Nurse Hanson further violated the standard of care and was deliberately indifferent to Melvin's serious medical needs by not returning within, at least, the hour to recheck Melvin's vitals.

119.    Once again, even if Melvin were suffering from withdrawals, the standard of care still required a complete assessment of Melvin's vitals, a thorough abdominal assessment, and a return by Nurse Hanson to recheck Melvin's vitals.

120.    Thus, Nurse Hanson was again deliberately indifferent to Melvin's medical needs and violated the standard of care even if Nurse Hanson incorrectly and recklessly assumed Melvin was just suffering from withdrawals.

121.    After Nurse Hanson and Deputy Clouse departed Melvin's cell at 1:51 p.m., Melvin's condition continued to deteriorate.

122.    Melvin continued to message Clouse and Nesler through the intercom saying his stomach was hurting.

123.    Melvin was in so much pain that he was yelling in his cell.

124.    Deputy Clouse then briefly looked into Melvin's cell at 2:11 p.m. for mere seconds.

125.    Deputy Nesler briefly conducted a well-being check on Melvin at 2:37 p.m., which consisted of her peering into Melvin's cell for mere seconds.

126.    Deputy Clouse conducted a well-being check on Melvin at 3:02 and 3:29 p.m.  Deputy Clouse's 3:02 p.m. and 3:29 p.m. well-being checks consisted of him peering into Melvin's cell for approximately five seconds.

127.    Each time the Deputies saw Bush it would have been obvious to any layperson that Melvin had serious medical needs and needed the attention of a doctor, but they failed to do anything to get Melvin that medical attention.

128.    At about 3:45 p.m. an inmate again grabbed Deputy Clouse's attention and asked him to check on Melvin.

129.    Deputy Clouse said he went to Melvin's cell and found that he was "kind of ragged again, breathing funny."

130.    Despite the County's proffered timeline of events leading up to Melvin's death indicating that Deputy Clouse "interacted with Bush at around 15:45," and Deputy Clouse's Narrative Report saying the same, surveillance footage does not show Deputy Clouse interacted with Melvin from 3:29 p.m. until 3:57 p.m.

131.    Deputy Clouse completed a "wellbeing check" at approximately 3:55 p.m., which consisted of him again briefly peering into Melvin's cell for four seconds. This time however, another inmate approaches Deputy Clouse appearing to plead with the Deputy to properly check on Melvin's status. Deputy Clouse left and then returned to Melvin's cell and interacted with Melvin at 3:57.

132.   Deputy Clouse said he walked in and asked Melvin if he was "doing good[.]"

133.   Melvin responded, 'No, I need medical, my stomach is still hurting."

134.   Deputy Clouse also observed that Melvin's "eyes were wide and his breathing was staggered…"

135.   It would have been obvious to any layperson at this point that Melvin had objectively serious medical needs and needed to see a doctor.

136.   Deputy Clouse again told Melvin that he was just experiencing withdrawals and ignored Melvin's pleas for medical help.

137.   He observed Melvin laying, breathing heavily, moaning, and groaning.

138.   Yet, Deputy Clouse did nothing to help Melvin address his obvious and serious medical needs.

139.   Deputy Clouse returned to the command room and informed Deputy Nesler of his observations of Melvin, i.e., breathing heavily, moaning, groaning.

140.   Yet, Deputy Nesler also did nothing to help Melvin and address his obvious and serious medical needs.

141.   At approximately 4:15 p.m. Deputy Nesler completed a wellbeing check and observed that Melvin was stiff with his jaw wide open.

142.   Instead of immediately assisting Melvin, Deputy Nesler continued to check on other detainees.

143.   Deputy Nesler then returned to Melvin's cell and could not observe Melvin's chest rising and falling.

144. Deputy Nesler again did not provide Melvin with immediate assistance but called Deputy Clouse to the cell to also look at Melvin.

145. The deputies entered the cell.

146. Deputy Clouse observed that Melvin was cold to the touch and Deputy Clouse believed he eventually found a faint pulse on Melvin.

147. Attempts to immediately contact medical were unsuccessful.

148. Deputy Clouse then called for medical assistance over the radio.

149. Correctional staff arrived to assist with medical arriving at approximately 4:25 p.m.

150. Staff engaged in lifesaving efforts until paramedics arrived.

151. Melvin was brought to the Mayo Clinic Emergency Department, where lifesaving efforts continued.

152. Melvin was declared dead at 5:21 p.m. on March 5, 2023.

153. The autopsy report reflected that Melvin's cause of death was acute complications of a perforated duodenal ulcer.

154. The presence of the seropurulent peritoneal fluid in the abdominal cavity reflects that Melvin's perforated ulcer likely spilled its gastric contents, digestive enzymes, and/or blood into the sterile peritoneal cavity, causing peritonitis, which ultimately progressed to sepsis and caused Melvin's death.

### III.    Advanced Correctional Healthcare's[1] history of similar failures

155.    ACH has a long and troubling history of failing to meet constitutional standards of care for individuals in custody.  As a private, for-profit company, ACH touts itself as the "nation's largest jail contract management company," providing healthcare services at over 370 sites in 22 states, including at least 19 facilities in Minnesota. Despite its extensive reach, ACH's track record reveals systemic failures in providing adequate medical care, particularly in cases involving severe abdominal issues, gastrointestinal conditions, and withdrawal management.

156.    Since 2011, over 300 individuals have died in facilities where ACH was the contracted healthcare provider, and ACH has been involved in numerous lawsuits, paying out more than $25 million in settlements.  Many of these cases demonstrate patterns of deliberate indifference to inmates' serious medical needs, including failures that mirror the circumstances of Melvin's highly preventable death.

157.    Examples of death occurring as a result of deliberate indifference to the serious medical needs of individuals with gastrointestinal conditions and/or failure to properly monitor a detainee's vitals include:

a.    Timothy Strayer: While detained at the Dearborn County Jail in Indiana in July 2011, Mr. Strayer suffered from intense stomach pain due to an untreated hernia.  Despite his repeated pleas for help and similar requests from fellow inmates, ACH care providers failed to transfer him to a hospital until he

---

[1] Each of the allegations related to ACH in this Section III apply with equal force to its subsidiary and co-defendant, USA Medical.

was unable to walk. He required emergency surgery for a perforated duodenal ulcer and spent nearly 200 days in the hospital recovering.  The case settled in February 2017. *See Strayer vs. Dearborn County*, S.D. Ind. New Albany Div., Case No. 4:12-cv-00098.

b.      James Watts: In October 2011, Mr. Watts developed severe stomach pain while detained at the Summit County Jail in Ohio.  His condition was misdiagnosed as withdrawal, and despite pleas from fellow inmates, he was denied necessary medical intervention.  He died of a ruptured viscus with peritonitis due to complications from peptic ulcer disease.  The medical examiner concluded that Mr. Watts "urgent medical intervention would have been readily evident to even a non-medically trained individual."  The case settled in April 2015.  *See Watts vs. Summit County*, N.D. Ohio Eastern Div., Case No. 5:13-cv-00549.

c.      Devin Nugent: While detained at the Franklin County Jail in Missouri in November 2017, Mr. Nugent suffered from untreated appendicitis. He experienced severe abdominal pain, vomiting, and hallucinations before his appendix ruptured, resulting in his death six days after incarceration.  ACH staff failed to order appropriate tests, manage Mr. Nugent's symptoms, conduct proper assessments, diagnose his symptoms, or provide medical care to Mr. Nugent.  The case settled in April 2020. (*Nugent vs. Franklin County*, E.D. Mo., Case No. 4:18-cv-02042).

d.      Tanisha Jefferson: Ms. Jefferson was detained in the Madison County, Alabama, jail in October 2013, where she repeatedly complained of severe

26

abdominal pain arising from a bowel obstruction for eleven days, of which the ACH defendants were aware. She was only prescribed laxatives. Despite her pain increasing to the point that she could no longer walk, lack of appetite, vomiting, and passing out, she was not sent to a hospital. The nurse misrepresented her condition and omitted the alarming symptoms from her notes. She died from complications of a bowel obstruction. The case settled in January 2024. (*Jefferson vs. Madison County, et al*, N.D. Ala. Northeastern Div., Case No. 5:14-cv-01959).

e.      Christopher Sullivan: When Mr. Sullivan was brought to the Anderson County jail in Tennessee in 2014, he could not stand up. After he was admitted, he was left in his cell while an ACH nurse ignored his medical condition before Mr. Sullivan died. Despite the records indicating otherwise, the nurse failed to conduct a medical assessment. Following that death, it was revealed that ACH knew about the nurse's past history of repeatedly failing to provide assessments. The nurse would be later charged with a felony for falsifying records related to Mr. Sullivan's death. The case settled in February 2017. (*Hailey v. Anderson County, et al.*, E.D. Tenn. Chattanooga Div., Case No. 3:15-cv-280).

f.      Ms. Copeland informed an ACH nurse that she would be withdrawing from heroin when she was detained at the Richland County jail in Ohio in May 2022. She went through extreme withdrawal symptoms and delirium while being denied appropriate medical treatment. Jail staff failed to take her vitals for several days. She was found not breathing with vomit coming out her month, then pronounced dead when she was taken to the hospital a half hour later.

Her cause of death was listed as dehydration with renal failure.  ACH settled the case in September 2024. (*Copeland v. Richland County et al.*, N.D. Ohio Eastern Div., Case No. 1:23-cv-1517).

158.    ACH's systemic issues are not limited to isolated cases.  Investigations and lawsuits have repeatedly revealed patterns of understaffing, inadequate training, and prioritization of cost-saving over patient care.  These systemic failures have contributed to preventable deaths and injuries, including cases with conditions similar to Melvin's, where gastrointestinal perforations and life-threatening abdominal conditions went untreated despite obvious and serious symptoms.

159.    Even after Melvin's death, ACH continues to face allegations of inadequate medical care.  Recent cases, such as those involving Miles Jackson and Cristian Coba-Rivera at the Anoka County Jail in Minnesota, underscore the persistent nature of ACH's failures.  Both individuals died under ACH's care due to preventable complications, highlighting the company's ongoing inability to fulfill its constitutional obligations.  Jackson's cause of death was identified as complications of a gastric ulcer perforation.

160.    As part of ACH's cost-cutting policies and practices, ACH staff consistently provide incomplete medical assessments, fail elevate concerns to advanced medical practitioners, and ignore life-threatening symptoms.

161.    ACH consistently misdiagnoses serious medical conditions as withdrawal symptoms, indicating an effort to avoid providing more costly, but necessary, medical treatment.

162.   ACH engages in practices of deliberate ignorance and indifference, such as incomplete assessments and misdiagnoses, to limit findings of liability of failing to perform their constitutional obligations.

163.   These documented failures demonstrate a clear and consistent pattern of deliberate indifference to the serious medical needs of individuals in custody.  ACH's history of inadequate care provides critical context for understanding Melvin's preventable death.

**Count I**
**42 U.S.C. § 1983**
**Eighth and/or Fourteenth Amendment Violations**
*Plaintiff v. Individual Capacity Defendants Hanson, Nesler, and Clouse*

164.   Plaintiff incorporates all allegations as if fully stated herein.

165.   Melvin suffered from obvious and objectively serious medical needs.

166.   The Defendants named in this Count owed Melvin a duty to provide for Melvin's medical needs, safety, and general welfare.

167.   The Defendants named in this Count knew that Melvin had obvious and objectively serious medical needs that created a high risk of harm, including death, if not properly assessed, addressed, and monitored.

168.   Any layperson observing Melvin at the times when each of these individual defendants did would easily recognize Melvin's obvious need for a doctor's attention.

169.   The Defendants named in this Count, under color of state law, acted with deliberate indifference to Melvin's serious medical needs in several ways, as detailed herein and as shall be set forth with additional discovery.

170.    Defendants' deliberate indifference to Melvin's obvious and serious medical needs violated his Fourteenth Amendment right to receive adequate medical care.

171.    Plaintiff alleges in the alternative that each of these Defendants knew that Melvin was suffering from these constitutional violations, had a realistic opportunity to intervene to stop these constitutional violations, but failed to intervene either maliciously or with reckless disregard for whether Melvin's rights were violated.

172.    Any medical care that was provided by any of the individual Defendants deviated so substantially from professional standards that it amounted to deliberate indifference.

173.    The inadequate medical care that was provided to Melvin was conducted in such a way that exacerbated Melvin's condition by forcing him to hobble or crawl to the table to take his vital signs, which were routinely incomplete.

174.    As a result, the Defendants named in this Count engaged in conduct that was in violation of the Eighth and/or Fourteenth Amendment to the United States Constitution.

175.    Melvin died as a direct and proximate result of the acts and omissions by the Defendants named in this Count.

176.    As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Melvin sustained compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

177.    The compensatory damages include but are not limited to pain and suffering and loss of enjoyment of life.

178.    Punitive damages are available against the Defendants in this Count and are hereby claimed as a matter of federal common law.

179.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees.

180.    As a direct and proximate result of these wrongful acts and omissions, Melvin's next of kin have suffered pecuniary losses, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

### Count II
### 42 U.S.C. § 1983
### Eighth and/or Fourteenth Amendment Violations
#### *Plaintiff v. ACH and USA Medical*

181.    Plaintiff incorporates all allegations as if fully stated herein.

182.    ACH and USA Medical acted under color of state law at all relevant times.

183.    The Defendants named in this Count are subject to liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and/or *City of Canton v. Harris*, 489 U.S. 378 (1989).

184.    On, prior to, and after March 5, 2023, ACH and USA Medical and their final policymakers acted with deliberate indifference to the rights of Melvin and others when it tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the serious medical needs, safety, well-being, and welfare of inmates and/or detainees that presented with serious medical health concerns at the Jail.

185.    On and prior to March 5, 2023, ACH and USA Medical had notice of the constitutionally deficient medical care and unconstitutional customs and practices, yet with deliberate indifference to the rights of Melvin and others, provided constitutionally deficient medical care to Jail detainees and inmates.

186.    Examples ACH's and USA Medical's constitutional customs include but are not limited to: failing to train staff to properly conduct abdominal examination; failing to train staff on how to properly assess the objectively serious medical needs of inmates with potentially critical abdominal ailments; failing to train employees to distinguish withdrawal symptoms from serious medical conditions, or in the alternative, training their employees to misdiagnose serious medical conditions as withdrawal symptoms; failing to require, or in the alternative, discouraging, their employees from taking complete vital signs to prevent their clients from incurring costs related to escalated medical care and/or to avoid documenting vitals which are indicative of standard of care violations.

187.    The unconstitutional customs and practices were the moving force behind Melvin's death and the violation of his constitutional rights.

188.    Melvin's death was the direct and proximate result of acts and omissions by the Defendants named in this Count.

189.    As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Melvin sustained compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

190.    Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees.

191.    As a direct and proximate result of these wrongful acts and omissions, Melvin's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**Count III**
**Wrongful Death Under Minnesota State Law**
*Plaintiff v. The County, ACH, and USA Medical*

192.    Plaintiff incorporates all allegations in this Complaint as if fully stated herein.

193.    The individual Defendants and other employees of the County, ACH, and USA Medical all owed Melvin a duty to provide for Melvin's well-being and safety.

194.    The Defendants named in this Count knew or should have known that Melvin was at a high risk of death, given his prior medical history and current medical condition.

195.    The individual Defendants and other employees of ACH and USA Medical deviated from the requisite ordinary and professional standards of care with respect to Melvin, as detailed herein and as shall be set forth with additional discovery.

196.    Some of these individual Defendants, including the Defendant Nurses, are classified as health care providers under Minnesota law.

197.    Plaintiff has supplied a declaration of expert review pursuant to Minnesota Statute § 145.682, subd. 4, attached to the initial Complaint as Exhibit A.

198.    The County is directly liable for their operational failures as set forth herein.

199.    The County is also vicariously liable for the individual acts and omissions identified of all the individual defendants identified herein, including breach of ministerial duties, as those individuals were acting within the course and scope of their duties as employees or agents of the County.

200.    ACH and USA Medical are vicariously liable for the acts of Nurse Hanson.

201.    The conduct herein amounts to wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

202.    These wrongful act and omissions directly and proximately caused Melvin's death.

203.    These wrongful acts and omissions caused Melvin to endure pain and suffering in addition to all other available categories of compensatory damages.

204.    As a direct and proximate result of these wrongful acts and omissions, Melvin's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**Plaintiff demands a trial by jury for issues of fact herein.**

## <u>Prayer for Relief</u>

WHEREFORE, Plaintiff Areryana Bush, as Trustee for the next of kin of Melvin Bush, prays for judgment against Defendants as follows:

1.    As to Count I, a money judgment against the individual capacity defendants Hanson, Nesler, and Clouse, for compensatory, special, and punitive damages in an amount to be determined by a jury but in excess of $75,000, together with costs and

disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and

prejudgment interest, in addition to compensatory damages for the next of kin in an

amount to be determined by a jury.

2. As to Count II, a money judgment against ACH and USA Medical for

compensatory and special damages in an amount to be determined by jury but in excess

of $75,000, together with costs and disbursements, including reasonable attorneys' fees,

under 42 U.S.C. § 1988 and prejudgment interest, in addition to compensatory damages

for the next of kin in an amount to be determined by jury.

3. As to Count III, a money judgment against Olmsted County, ACH, and

USA Medical for compensatory damages for the next of kin in an amount to be

determined by jury but in excess of $75,000, in addition to costs, disbursements, and

prejudgment interest.

4. For such other and further relief as this Court deems just and equitable,

including but not limited to injunctive relief to correct the unconstitutional customs and

practices of ACH and USA Medical.

**STORMS DWORAK LLC**

Dated: January 27, 2025

/s/ Jeffrey S. Storms
Jeffrey S. Storms, #387240
Joseph T. Heegaard, #401544
222 South 9th Street, Suite 470
Minneapolis, MN 55402
Phone: 612.455.7055
Fax: 612.455.7051
jeff@stormsdworak.com
joe@stormsdworak.com

*Attorneys for Plaintiff*